## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**PERRY B. FAULKNER**                                           **PLAINTIFF**

**v.**                            Case No. **4:18-cv-00353 KGB**

**TAB TOWNSELL, individually, and in his**
**official capacity as Mayor of the City of**
**Conway, Arkansas,** *et al.*                                **DEFENDANTS**

## OPINION AND ORDER

Plaintiff Perry B. Faulkner brings this action against defendants Mayor Tab Townsell and Lisa Mabry-Williams, each in their individual and official capacities, and the City of Conway, Arkansas (collectively "defendants"), alleging violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), and the Arkansas Civil Rights Act, Arkansas Code Annotated §§ 16-123-101, *et seq.* ("ACRA"), as well as violations of Mr. Faulkner's due process rights (Dkt. No. 1). Before the Court is defendants' motion for summary judgment (Dkt. No. 17). Mr. Faulkner responded in opposition (Dkt. No. 24), and defendants replied (Dkt. No. 30). For the following reasons, the Court grants defendants' motion for summary judgment (Dkt. No. 17).

### I.      Factual Background

Unless otherwise noted, the following facts are taken from defendants' statement of undisputed material facts and Mr. Faulkner's response to defendants' statement of undisputed material facts (Dkt. Nos. 18, 25).

### A.      The Parties

The City of Conway, Arkansas ("the City"), is a city of the first class, with a population of about 62,000 citizens (Dkt. No. 18, ¶ 1). The City employs over 500 individuals at a given time

(*Id.*).  The City is a mayor-council form of government and provides a number of services to Conway's citizenry (*Id.*, ¶ 2).  All employees of the City are at-will employees, and the City claims that it is an equal opportunity employer (*Id.*, ¶ 3).  According to defendants, City employees are hired at a set hourly rate and are not guaranteed wage increases or cost of living ("COLA") increases (*Id.*, ¶ 4).  Plaintiff claims that there are some hourly employees, but most employees have salaries set according to the current pay system, which may be converted to an hourly calculation for payroll purposes (Dkt. No. 25, ¶ 4).  All wage increases, including step increases and COLA increases, aside from increases because of an internal promotion, are and must be approved by the City Council (Dkt. No. 18, ¶ 5).  Reclassification of an existing position must also be approved by the City Council as well (*Id.*¸ ¶ 6).

Separate defendant Ted Townsell is the former Mayor of the City; a position he held continuously from January 1, 1999, to December 16, 2016 (*Id.*, ¶ 12).  Mayor Townsell is currently 57 years old (*Id.*, ¶ 13).  Separate defendant Lisa Mabry-Williams is and has been the Human Resources Director for the City since 2003, for a total of 16 year (*Id.*, ¶ 7).  Ms. Mabry-Williams is currently 60 years old (*Id.*, ¶ 8).  Defendants represent that the City has not used a merit-based compensation scheme during Ms. Mabry-Williams' 16-year tenure as Human Resources Director (*Id.*, ¶ 10).  Mr. Faulkner denies this statement and claims that under the City's previous 7-step pay system, persons who were not in good standing due to disciplinary action or probationary status were not given any approved step increases, and the pay system was in effect during Ms. Mabry-Williams' tenure as Human Resources Director (*Id.*).  Defendants aver that at no point in Ms. Mabry-Williams' tenure has the City used a compensation scheme that took into consideration an employee's longevity or tenure as an employee or compensated an employee for their longevity or tenure (Dkt. No. 18, ¶ 11).

Mr. Faulkner has sued Mayor Townsell individually because Mr. Faulkner believes that when the City did the JESAP study, he was clearly the assistance finance director but does not believe that the position was ever taken into consideration, and Mayor Townsell was responsible for that (*Id.*, ¶ 97).  Mr. Faulkner has sued Ms. Mabry-Williams in her individual capacity, because Mr. Faulkner believes that as a function of Human Resources, something as big as this should have been handled differently and that each employee should have had input into the ratings of their job descriptions (*Id.*, ¶ 98).

Mr. Faulkner was hired by the City on May 11, 1992, as an Assistant Finance Officer, and he is currently employed as Finance Manager, a position he has held since October 2006 (Dkt. No. 18, ¶ 14; Dkt. No. 25, ¶ 14).  Mr. Faulkner's current annual salary is $64,837.76 (Dkt. No. 25, ¶ 14).  He has received two recent COLA raises, a 3% raise in 2018 and a 1% raise in 2019 (*Id.*).  Mr. Faulkner is not a citizen of Conway, Arkansas (Dkt. No 18, ¶ 15).  He has a bachelor's degree in accounting, which he obtained from the University of Central Arkansas (*Id.*, ¶ 16).  Mr. Faulkner is a certified public accountant but is on inactive status (*Id.*, ¶ 17).  He is currently 51 years old and was 44 or 45 when the pay system about which he complains was implemented (*Id.*, ¶ 18).  Mr. Faulkner works within the Finance Department of the City and the Finance Department's Department Head is the Chief Financial Officer of the City (*Id.*, ¶ 19).

In May 2009, the City revised the job description of the Finance Manager and Mr. Faulkner admits that, for the most part, the job description reflected the roles and responsibilities of his position for the City at that time (Dkt. No. 25, ¶ 20).  Defendants represent that the City updated its job descriptions again in 2013 and that the updated job description for the Finance is substantively nearly identical to the 2009 job description (Dkt. No. 18, ¶ 21).  Mr. Faulkner asserts that the revised description listed additional duties and responsibilities not included in the 2009 job description (Dkt. No. 25, ¶ 21).  He claims that this is significant because the updated job

description was left out of the 2012 JESAP update and therefore his midpoint pay was a reflection of the 2009 calculations and not current market rates or other analysis that other employees received the benefit of (*Id.*).

### B.     The Seven-Step Compensation System

From 2001 to 2012, the City claims that it used a seven-step compensation system, in which each position with the City was assigned a base pay, step one, and a maximum pay, step seven (Dkt. No. 18, ¶ 22).  An employee progressed through the steps receiving up to six raises until reaching the maximum pay assignment (*Id.*).  If the City Council awarded step increases, an employee who had already reached step seven would not receive a compensation increase (*Id.*). Step increases could be and were awarded to the entire pay grid annually at the discretion of the City Council, as were COLA increases, according to the City (*Id.*, ¶ 23).  An employee, upon attaining the seventh step within his or her position, would be maxed out with respect to his or her compensation in that particular position under the seven-step system, and should the City award step increases, the maxed-out employee's compensation would not change (*Id.*).  However, the maxed-out employee would, if awarded to the entire pay grid, receive a COLA increase (*Id.*). During the City's use of the seven-step compensation system, Mr. Faulkner obtained step six in the seven-step compensation system (Dkt. No. 18, ¶ 24).

### C.     The 2008 Job Evaluation And Salary Assessment Program ("JESAP") Study

In 2000, before the City adopted its seven-step pay grid, the City did an in-house market analysis to determine the minimum and maximum compensation amounts for each position (*Id.*, ¶ 25).  Around 2008, the City began to receive complaints about and lose employees because of its compensation scheme, which was inadequate when compared to the market (*Id.*, ¶ 26).  The City no longer felt comfortable undertaking the complex, extensive task of a salary market analysis and

decided to engage a third-party specialist—the Johanson Group (*Id.*, ¶ 27).  The City first engaged

the Johanson Group in 2008 to update the City's job descriptions and perform a job evaluation and

salary survey (*Id.*, ¶ 28).  Defendants assert that, before and after being engaged, the Johanson

Group thoroughly explained the methodology of the Job Evaluation and Salary Assessment

Program ("JESAP") to the City (*Id.*, ¶ 29).  Mr. Faulkner contends that the JESAP was not

thoroughly explained to the City employees (Dkt. No. 25, ¶ 29).

To update the City's job descriptions, the Johanson Group tasked the City's department

heads with completing a Policy Analysis Questionnaire Report ("PAQ") for each position within

the department head's respective department (Dkt. No. 18, ¶ 30).  Mr. Faulkner claims that the

PAQs were supposed to be prepared by employees and that elected officials and department heads

were to interview and review the positions and organizational makeup and lines of authority (Dkt.

No. 25, ¶ 30).  He claims that the Johanson Group never had a meeting with department heads to

explain the PAQs, not all questionnaires were filled out or were incomplete, and employees were

not included in the process (*Id.*).  According to defendants, the PAQs were completed by

employees—the department heads—and the fact that Mr. Johanson does not remember the date of

the meeting or which people were in the meeting with department heads does not indicate that a

meeting never occurred (Dkt. No. 31, at 3-4).  The parties agree that Mr. Faulkner was never asked

to complete a questionnaire (*Id.,* at 4).

The completed PAQs were submitted to the Johanson Group, which then used the reports

to create and update the City's job descriptions (Dkt. No. 18, ¶ 31).  Defendants assert that the

Johanson Group then created a report for the City, which included the establishment of the

midpoint market pay for each position, and a correlating minimum market pay and maximum

market pay for each position (*Id.*, ¶ 31a).  They represent that the Johanson Group's process and

report was presented to the Human Resources Department, the Mayor, and ultimately to the City

Council at open public meetings multiple times (*Id.*, ¶ 31b).  The Johanson Group's methodology rates a position, based on the minimum requirements to perform the essential functions of a particular position, rather than rating the person in the position, in order to create an objective and competitive compensation scheme (*Id.*, ¶ 32).  The Johanson Group used the updated job descriptions to analyze each job title within the City using 15 rating factors (*Id.*, ¶ 33).  Each job title was awarded a score on all 15 factors (*Id.*, ¶ 34).  According to defendants, once each job title was scored on the 15 factors, the Johanson Group met and reviewed the scores assigned to each job title with all department heads to ensure buy-in and accuracy of the ratings (*Id.*, ¶ 35).  Mr. Faulkner maintains that it is unclear who generated the data that was submitted to the Johanson group and how it was used to update the job descriptions (Dkt. No. 25, ¶¶ 31-33).

According to defendants, once the department heads reviewed the scores assigned to the job titles on the 15 factors, the Johanson Group applied their proprietary factor weighting system, which is an algorithm unknown to all parties, to the individual scores on each of the factors to produce a total score for each job title (Dkt. No. 18, ¶ 36).  The Johanson Group then conducted a straight-line regression comparing the City's job title and points-per-pay to determine if the City's compensation scheme was internally consistent and to create an internal average (*Id.*, ¶ 37).  The job descriptions and salaries for job titles were compared with job descriptions and salaries of comparable job titles of similarly sized cities and cities within Conway's recruitment area to determine if the City's compensation scheme was competitive to the comparison cities (*Id.,* ¶ 38).  In 2009, the comparison of the City's internal points-per-pay average and the 12 comparison cities determined that Conway's compensation scheme overall was nearly 1% above the market average (*Id.*, ¶ 39).  Defendants assert that, based on these results, and to keep Conway's compensation scheme competitive for the 12 months after the end of the survey, the Johanson Group recommended a compensation scheme which adjusted Conway's actual internal pay average 2%

higher to create a suggested midpoint to be competitive with the salary market (*Id.*, ¶ 40).  Mr. Faulkner generally claims that the calculations used were either flawed, incomplete, or unknown (Dkt. No. 25, ¶¶ 37, 39-41).  He claims that the methodology and process of the JESAP study is suspect because:  (1) its formula calculations are hidden under a claim of proprietary information, which the Johanson Group has not released; (2) the system has holes in it for self-serving manipulation of the data; and (3) not all employees were or have been evaluated equally, including Mr. Faulkner (*Id.*, at 27).

The Johanson Group provides its customers with a suggested one-step pay structure and suggests wage amounts for every job title at the market rate, midpoint line, below the market rate, its minimum line, and above the market rate, its maximum line (Dkt. No. 18, ¶ 41).  Organizations then determine at which point in the suggested structure they wish to compensate their employees; the Johanson group simply provides the suggested structure options (*Id.*, ¶ 42).

### D.      The 2012 JESAP Study Update

The Johanson Group's report was completed in 2009; however, the City did not take any action with respect to its compensation system because the City discovered it was in financial straits in early 2010 (*Id.,* ¶ 43).  Defendants represent that the City's reasoning for seeking a new compensation scheme initially was to ensure that the City was competing at a market rate with respect to its positions, as it had been losing employees to other employers (*Id.*, ¶ 43a).  Mr. Faulkner claims that the City wanted to save money (Dkt. No. 25, ¶ 43a).  Defendants assert that, in 2012, the City realized that the then current seven-step compensation system was financially unsustainable when projected into the future (Dkt. No. 18, ¶ 44).  Specifically, under the seven-step system, assuming step increases would be awarded annually as had been done previously, all parties agree that the City would have to add about $350,000.00 each year to its budgeted personnel costs, over and above the previous year's personnel costs (*Id.*, ¶ 45).

According to defendants, the seven-step system could not sustain fluctuations in revenue, which was particularly concerning, given what the City had recently experienced with its specific financial crisis and in the light of the national economy beginning in 2008 (*Id.*, ¶¶ 46-47).  The City experienced financial crisis and overspent, and revenues decreased in 2008 and 2009, corresponding to the national recession (*Id.*, ¶ 49).  Defendants represent that, as a result of determining that the seven-step system was unsustainable financially, the City decided to update the 2009 JESAP study and re-engaged the Johanson Group (*Id.*, ¶ 50).  The 2009 study was updated in July 2012 (*Id.*, ¶ 51).

Defendants claim that the methodology of the 2012 update was substantially similar to that of the 2009 study; however, the job descriptions were already created and only had to be reviewed and the number of comparison cities was lowered to six instead of 12 (*Id.*, ¶ 52).  The 2012 salary update determined that the City was 6.28% behind comparable cities in terms of compensation (*Id.,* ¶ 53).  According to defendants, the pay structure recommended by the Johanson Group following the 2012 update was to upwardly adjust the internal average pay, created by conducting a straight-line regression of total rating points-per-pay for each job title, by 6.2% to create a midpoint for each position (*Id.*, ¶ 54).  The minimum and maximum for each position was created by taking 90% and 110% of the midpoint (*Id.*).  Mr. Faulkner maintains that "the Johnson Group's methodology and process remained flawed, incomplete (not all positions rated), or unknown." (Dkt. No. 25, ¶¶  53-54).

Prior to the implementation of the midpoint system in January 2013, multiple employees and department heads complained about the rating given to various positions (Dkt. No. 18, ¶ 55).  The Personnel Committee, which is comprised of City Council members, upon becoming aware of the complaints, tasked the City staff to review those particular positions, in order to justify that the positions were being accurately rated, and if not, make adjustments (*Id.*).  As a result of the

review, several, but not all, of those positions were adjusted upward prior to the implementation of the midpoint system in 2013 (*Id.*, ¶ 57). Defendants assert that neither Mr. Faulkner, nor his department head, reported any issues with the ratings given to the Finance Department positions (*Id.*, ¶ 57a). Mr. Faulkner contends that he did not report any issues with the ratings because he never saw the ratings (Dkt. No. 25, ¶ 57a).

The City, by virtue of City Council vote, then appropriated funds to adopt the one-step pay structure produced in the 2012 update to the JESAP study, and it was adopted as of January 1, 2013 (Dkt. No. 18, ¶ 58). Defendants claim that the City chose to adopt a single-point compensation system based on the market midpoint for each position established by the JESAP report (*Id.*, ¶ 59). Any non-uniformed employee who was being compensated below the midpoint for his or her position was given a one-time pay increase to the midpoint for that particular position, as established by the JESAP report (*Id.*, ¶ 60). Non-uniformed city employees who were being compensated at or above the midpoint did not receive any change in their pay (*Id.*, ¶ 61). In the 2012 update to the JESAP study, there were no points of comparison for the City's job title of Finance Manager (*Id.*, ¶ 62). Defendants assert that, in the circumstance where there was no point of comparison for a job title, the market rate for that job title was determined by comparing the internal average points-per-pay for a job title, as determined by applying the Johanson Group's weighted formula to the job title's rating on the PAQs, to the market's average points-per-pay (*Id.*, ¶ 63). The Johanson Group's system rated the City's job title of Finance Manager at 1,294 points in the 2012 update to the salary market survey (*Id.*, ¶ 64). When the City's internal points-per-pay average was adjusted upward 6.2% to be competitive with the market, the midpoint, or market rate, for a job title rated at 1294 total points was $56,756 (*Id.*, ¶ 65). The below-market rate was set at $51,080 and the above-market rate was set at $62,432 (*Id.*).

Mr. Faulkner was being paid $61,715, nearly $5,000 higher than the midpoint, when the City adopted the one-step pay scale (*Id.*, ¶ 66). According to defendants, as of 2013, the City had about 234 non-uniformed, non-elected employees, 138 of whom were over the age of 40 (*Id.*, ¶ 67). Mr. Faulkner maintains that the City had 232 non-uniformed, non-elected employees and that 132 were over the age of 40 as of 2013 (Dkt. No. 25, ¶ 67). In 2013, about 66 of the City's non-uniformed, non-elected employees were paid higher than the midpoint established by the 2012 JESAP study (Dkt. No. 18, ¶ 68). In 2013, of the approximately 66 non-uniformed, non-elected employees who were paid higher than the midpoint established by the 2012 JESAP study, about 54 were over the age of 40 (*Id.*, ¶ 69). In 2013, four positions within the City did not have data from the JESAP study. Of those four positions, three of the employees who held those positions were over the age of 40 (*Id.*, ¶ 70). In 2013, of the City's 230 non-uniformed, non-elected employees, with data from the 2012 JESAP study, about 164 of the employees had their pay increased as a result of the City adopting the midpoint of the one-step pay structure (*Id.*, ¶ 71). Defendants claim that about 110 of the City's non-uniformed, non-elected employees who were over the age of 40, with data from the 2012 JESAP study, received pay increases as a result of the City adopting the midpoint of the one-step pay structure (*Id.*, ¶ 72). Mr. Faulkner claims that only 80 of the city's non-uniformed, non-elected employees who were over the age of 40 received pay increases (Dkt. No. 25, ¶ 72).

Mr. Faulkner was one of the employees who did not receive a pay increase as a result of the City adopting the midpoint of the one-step pay structure, because his annual salary was greater than the midpoint established by the JESAP study (*Id.*, ¶ 73). Mr. Faulkner's salary remained the same (*Id.*). Under the system as it was envisioned, should the City Council grant a COLA increase to the entire pay grid, any City employee with an annual salary greater than the midpoint would not receive that COLA increase until the midpoint rate for that position matched the employee's

current annual salary (*Id.*, ¶ 74).  Once the market pay for a particular position caught up to the employee's current above-market rate, the employee would once more begin to earn COLA increases as they are awarded (*Id.*, ¶ 75).  Defendants assert that, should an employee who was above market leave his or her employment with the City, the pay for the position would revert to the market midpoint, and the employee in that position would receive any COLA increases allotted by the City (*Id.*, ¶ 76).

According to defendants, in moving to the single midpoint system, the City achieved two goals:  (1) it is a competitive employer, both retaining current employees and attracting new employees when needed, and (2) it implemented a long-term financially sustainable compensation system that will save the City considerable personnel costs over the long term and can withstand fluctuations in revenue (*Id.*, ¶ 77).  Mr. Faulkner disagrees and claims that many employees are leaving the City's employment because they are locked into a pay system with no room for advancement (Dkt. No. 25, ¶ 77).  He asserts that refund contributions have steadily risen because employees are leaving and withdrawing their pension funds; in 2008 the City refunded contribution in the amount of $142,230 and in 2016 it refunded $211,123 (*Id.*).

Prior to adopting the new compensation scheme in 2013, the last COLA increase approved by the City Council was a 1% increase in 2010 (Dkt. No. 18, ¶ 79).  The City Council approved a COLA increase in 2018 and 2019 (*Id.*).  Despite the City's initial policy not to award COLA increases to employees whose annual salary was above the midpoint, Mr. Faulkner and other employees with an annual salary higher than the midpoint received both the 2018 and 2019 COLA increase (*Id.*, ¶ 80).  The City also awarded an annual bonus to all employees, including Mr. Faulkner, in December 2013 and each November from 2014 to 2018 (*Id.*, ¶ 81-81a).

Mr. Faulkner filed a Charge with the Equal Employment Opportunity Commission ("EEOC") on May 12, 2014 (*Id.*, ¶ 82).  Mr. Faulkner alleged in his Charge  that he was subject to

discrimination based on his age and that the discrimination began August 1, 2013, with the latest incident of discrimination on May 10, 2014 (Dkt. No. 25, ¶ 83).  Mr. Faulkner identified the discrimination as ongoing (*Id.*).  On September 22, 2014, the EEOC issued Mr. Faulkner a Dismissal and Notice of Rights (Dkt. No. 18, ¶ 84).

The behavior of the City about which Mr. Faulkner complains and asserts has a discriminatory impact based on age is the City's implementation of the one-step pay system suggested by the 2012 update to the JESAP study (*Id.*, ¶ 86).  Mr. Faulkner claims that the adoption and implementation of the one-step pay system is discriminatory because "it took money out of [his] paycheck," and he believes that his paycheck is tied to his years of service to the City (*Id.*, ¶ 87).  Mr. Faulkner does not believe that his age, or age in general, was taken into consideration when the City adopted the one-step pay system (*Id.*, ¶ 88).  Mr. Faulkner does not believe that the City intended to discriminate against him or anyone else when it adopted the one-step pay system (*Id.*, ¶ 89).  He recognizes that many of the City's employees over the age of 40 benefitted from the one-step pay system (*Id.*, ¶ 90).  Mr. Faulkner believes that the adoption of the one-step pay system negatively affects him because of his years of service—his pay is "frozen," and he can no longer receive COLA increases because his current annual salary is above the midpoint for his position as established by the JESAP study (*Id.*, ¶ 91).  He believes that the City adopted the one-step pay system to save money (*Id.*, ¶ 92).

The parties agree that simply because an employee has worked for the City for a long time does not mean that the employee is over 40 years-of-age (*Id.*, ¶ 96).  Mr. Faulkner does not think the City trying to save money is a bad thing, but he disagrees with how the City went about it (*Id.*, ¶ 99).  Defendants claim that the City wanted to adopt a compensation system where the City would pay an employee for the essential duties of the job and pay for the position, not the person actually performing the job (*Id.*, ¶ 100).

## II.     Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact in dispute and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.     Discussion

Defendants contend that they are entitled to summary judgment in their favor on Mr. Faulkner's ADEA claim because:  (1) Mr. Faulkner's claims are time-barred; (2) Mr. Faulkner failed to satisfy the procedural requirements of 29 U.S.C.A. § 623(f)(1); (3) Mr. Faulkner cannot set forth a *prima facie* disparate-impact claim; (4) the compensation scheme in question was adopted for a legitimate business reason motivated by a reasonable factor other than age; and (5) the ADEA does not recognize individual liability (Dkt. No. 19, at 1).  They claim that Mr. Faulkner' Fourteenth Amendment due process claims fail because the ADEA is the only remedy

for plaintiffs alleging age discrimination in employment and because Mr. Faulkner cannot show that he had any legally cognizable liberty or property interest in his employment in a salary increase (*Id.*, at 2). Defendants also claim that Mr. Faulkner's claims brought under the ACRA fail because: (1) age discrimination claims are not recognized by the ACRA; (2) age is not a suspect class under the equal protection clause and at will employees have no fundamental interest in their employment; (3) defendants can show a rational basis for their actions; and (4) the ACRA does not recognize individual liability for this type of claim (*Id.*).

### A. Mr. Faulkner Abandoned His Individual Liability, Fourteenth Amendment Due Process, And ACRA Claims.

Defendants assert that they are entitled to summary judgment in their favor on Mr. Faulkner's claims against Ms. Mabry-Williams and Mayor Townsell because individuals may not be held liable under the ADEA or the ACRA (Dkt. No. 19, at 9, 26). Defendants contend that Mr. Faulkner's Fourteenth Amendment due process claim pursuant to 42 U.S.C. § 1983 fails because the ADEA is the only remedy for age-based claims and Mr. Faulkner cannot identify any process to which he was constitutionally entitled that defendants denied him (*Id.*, at 23-24). Defendants also assert that they are entitled to summary judgment on Mr. Faulkner's ACRA claims because the ACRA does not provide protection for discrimination because of a person's age (*Id.*, at 26).

Mr. Faulkner did not address any of these arguments in his response to defendants' motion for summary judgment, and it appears that he has abandoned these claims. Moreover, this Court determines that individual supervisors may not be held liable under the ADEA. *See Zimmerman v. Ark. Dep't of Fin. & Admin.*, Case No. 5:17-cv-00160 JM, 2018 WL 700850 (E.D. Ark. Feb. 2m 2018), *aff'd*, 745 F.App'x 666 (8th Cir. 2018); *Smith v. Bankers Life and Cas. Co.*, 519 F.Supp.2d 964 (S.D. Iowa 2007) (examining reasoning under language of the ADEA and analogous Title VII cases). The weight of authority suggests that the ADEA is the exclusive

remedy for alleged age discrimination, not claims brought pursuant to 42 U.S.C. § 1983. *See Bass v. Univ. of Ark. Sys.*, Case No. 5:12-cv-00286-KGB, 2015 WL 5712850 (E.D. Ark. Sept. 29, 2015), *aff'd sub nom. Bass v. Univ. of Ark. at Pine Bluff*, 694 F.App's 458 (8th Cir. 2017) (examining legal authorities). Further, Mr. Faulkner's ACRA claims fail because the ACRA does not prohibit discrimination on the basis of age, which is the only type of discrimination Mr. Faulkner specifically alleges. *See* Ark. Code Ann. § 16-123-107. Accordingly, for all of these reasons, the Court grants defendants' motion for summary judgment with respect to Mr. Faulkner's claims against Ms. Mabry-Williams and Mayor Townsell. The Court also grants defendants' motion for summary judgment with respect to Mr. Faulkner's Fourteenth Amendment due process and ACRA claims. The Court enters judgment as a matter of law in favor of the City on these claims.

### B.     Statute Of Limitations

#### 1.     90-Day Time Period To File Suit

Defendants aver that Mr. Faulkner's ADEA claim is time-barred because the Arkansas savings statute is inapplicable to the ADEA, which is governed by a federal statute of limitations (Dkt. No. 19, at 5). This is a re-filing of an earlier case, *Faulkner v. Townsell, et al.,* Case No. 4:18-cv-353 KGB ("Faulkner I"), in which Mr. Faulkner moved to dismiss his complaint without prejudice. Mr. Faulkner filed a complaint in Faulkner I on December 22, 2019. In that complaint, Mr. Faulkner stated: "[a]ll conditions precedent to the filing of this action under the ADEA have been satisfied. On May 12, 2014, Plaintiff filed a Charge of Discrimination with the [EEOC] . . . . On September 22, 2014, the EEOC issued its Dismissal and Notice of Rights." On May 26, 2017, Mr. Faulkner moved to dismiss voluntarily without prejudice Faulkner I pursuant to Federal Rule of Civil Procedure 41, and this Court granted Mr. Faulkner's motion (Dkt. No. 19, at 5).

Defendants claim that, when Mr. Faulkner petitioned this Court to dismiss Faulkner I without prejudice, the effect was to bar Mr. Faulkner's claims under the ADEA because Mr.

Faulkner's filing of the complaint in the present case occurred on May 25, 2018, outside the statutory period requiring a complainant to file a civil action following a dismissal of his EEOC charge within 90 days (Dkt. No. 19, at 6-7).  Defendants claim that the Arkansas savings statute is inapplicable to Mr. Faulkner's claim because the ADEA is governed by a federal statute of limitations, and accordingly, Mr. Faulkner's claim under the ADEA is time-barred (Dkt. No. 19, at 6-7).

A suit filed under Title VII must be brought within 90 days after the receipt of the Notice of Right to Sue issued by the EEOC.  42 U.S.C. § 2000e-5(f)(1); *Williams v. Thomson*, Corp., 383 F.3d 789 (8th Cir. 2004); *Maeqdlin v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 949*, 309 F.3d 1051 (8th Cir. 2002).  An action may be dismissed, as barred by the statute of limitations, where a plaintiff's own pleadings establish the defense.  *McDaniel v. Kraft Glob. Foods*, 632 F. App'x 314, 315 (8th Cir. 2016) (concluding dismissal was proper where plaintiff's own pleadings showed that she brought her lawsuit more than 90 days after receiving a right-to-sue notice from the EEOC and tolling of the limitations period was not warranted); *see also Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008)  (citing *Varner v. Peterson Farms*, 371 F.3d 1011, 1017-18 (8th Cir. 2004)).

Although the 90-day limitations period is subject to equitable tolling in appropriate circumstances, courts have generally reserved the remedy of equitable tolling for situations in which the reasons for the delay were beyond the control of the plaintiff.  *See Hill v. John Chezik Imports*, 869 F.2d 1122, 1124 (8th Cir. 1989) (finding that equitable tolling of the 90-day period was not appropriate when the plaintiff did not inform the EEOC of her new address).  Mr. Faulkner mentions equitable tolling; however, his current complaint and response to defendants' motion for summary judgment do not allege any circumstances that might justify equitable tolling of the 90-

day limitations period as applied to his ADEA claim.  Based on the record in this case and Faulkner I, the Court is aware of no such circumstances.

Additionally, Arkansas Code Annotated § 16-56-126, which gives a plaintiff one year to refile an action after a nonsuit, will not save Mr. Faulkner's claim.  The Arkansas savings statute does not apply to lawsuits brought under Title VII or the ADEA.  *Garrison v. Int'l Paper Co.*, 714 F.2d 757, 759 n.2 (8th Cir. 1983) (stating that "[b]ecause Title VII actions are governed by a federal statute of limitations, the Arkansas saving[s] clause is inapplicable" (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946))).  Furthermore, the Eighth Circuit has held that, under Title VII, a dismissal without prejudice operates to leave a plaintiff as if no action had been filed.  *Id.* (citing *Moore v. St. Louis Music Supply Co., Inc.*, 539 F.2d 1191, 1194 (8th Cir. 1976)).  Thus, any dismissal of a Title VII or ADEA case that occurs, as it did here, more than 90 days after the right to sue letter issued is, in substance, a dismissal with prejudice.

The EEOC issued Mr. Faulkner a Dismissal and Notice of Rights on September 22, 2014.  By the Court's count, 90 days from September 22, 2014, was December 21, 2014, which was a Sunday.  Therefore, Mr. Faulkner had until the next day, Monday, December 22, 2014, to file suit relating to his EEOC claim.  Mr. Faulkner timely filed the Faulkner I complaint on December 22, 2014. However, Mr. Faulkner moved to dismiss Faulkner I and initiated the present cause of action on May 25, 2018, well outside the 90-day statute of limitation required by the ADEA.  Equitable tolling and the Arkansas savings statute do not apply here.  Therefore, Mr. Faulkner's ADEA claim is time-barred because he brought this cause of action more than 90 days after the EEOC issued his Dismissal and Notice of Rights.  Accordingly, the Court grants defendants' motion for summary judgment with respect to Mr. Faulkner's claims under the ADEA.

17

## 2.      180-Day Time Period To File Charge

Defendants assert that Mr. Faulkner's ADEA claim is also untimely under U.S.C. §

626(d)(1)(A), which requires that a complainant file a charge with the EEOC within 180 days after

the alleged unlawful practice occurred (Dkt. No. 19, at 7).  Mr. Faulkner attempts to invoke the

continuing violation doctrine in an effort to salvage his untimely ADEA claim (Dkt. No. 26, at 12-

18).  The continuing violation doctrine applies to determine whether the administrative filing

requirements under Title VII or the ADEA have been satisfied.  In other words, courts apply this

doctrine to determine whether the 180-day time period for filing an EEOC charge has been

satisfied based on the timing and nature of the alleged discriminatory conduct.  *See, e.g., Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (examining doctrine); *Wedow v. City of Kansas*

*City, Mo.*, 442 F.3d 661 (8th Cir. 2006) (same).  There is no indication in the record before the

Court that Mr. Faulkner filed an EEOC Charge after filing one on May 12, 2014, for which the

EEOC issued on September 22, 2014, a Dismissal and Notice of Rights.  The continuing violation

doctrine does not aid Mr. Faulkner in arguing the timeliness of his current claim.

Moreover, the 180-day period in which to file an EEOC Charge also may be subject to

equitable tolling in appropriate circumstances, like the 90-day time period to file suit.  Again, in

these circumstances, courts have generally reserved the remedy of equitable tolling for situations

in which the reasons for the delay were beyond the control of the plaintiff.  *See Baldwin Cty.*

*Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke

equitable principles to excuse that lack of diligence."); *Heideman v. PFL, Inc.*, 904 F.2d 1262,

1266 (8th Cir. 1990) ("Equitable tolling is appropriate only when the circumstances that cause a

plaintiff to miss a filing deadline are out of his [or her] hands."), *cert. denied*, 498 U.S. 1026

(1991).  Neither Mr. Faulkner's current complaint nor response to defendants' motion for summary

judgment allege any circumstances that might justify equitable tolling of the 180-day period for

filing an EEOC Charge, and based on the record in this case and Faulkner I, the Court is aware of no such circumstances.  Regardless, equitable tolling of the 180-day period for filing a charge does not aid Mr. Faulkner in arguing the timeliness of his current claim.

The Dismissal and Notice of Rights issued on September 22, 2014, triggered the 90-day period for filing suit, and for the reasons previously explained, neither equitable tolling of the 90-day period to file suit, the Arkansas savings statute, the continuing violation doctrine, nor equitable tolling of the 180-day period to file an EEOC Charge apply here.  These arguments do not aid Mr. Faulkner with respect to assessing the timeliness of his current suit.  His current ADEA claim is time-barred.

### C.     Merits of Claim

Defendants claim that they are also entitled to summary judgment on Mr. Faulkner's ADEA claim because he cannot establish a *prima facie* disparate-impact claim (Dkt. No. 19, at 9).  When asserting an ADEA disparate-impact claim, generally an employee asserts that a facially neutral action or policy has the effect of discriminating against the employee because of age; it does not require a finding of an intent to discriminate.  *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 238 (2005).  To establish a *prima facie* disparate-impact claim, a plaintiff must "identify a specific employment practice" and show through "statistical evidence of some kind and degree sufficient" that the employment practice "caused the plaintiff to suffer adverse employment action" because of the plaintiff's age.  *Eggers v. Wells Fargo Bank, N.A.,* 899 F.3d 629, 633 (8th Cir. 2018).  The plaintiff must identify a "specific test, requirement, or practice" that has an "adverse impact on older workers"; it is not enough to provide a bald allegation of disparate impact or to "point to a generalized policy."  *City of Jackson,* 544 U.S. at 241.

Mr. Faulkner contends that he has satisfied the requirements of a *prima facie* claim (Dkt. No. 24, at 19).  He claims that the City's new pay system is a facially neutral policy that has a

disparate impact on employees over age 40 because all employees making more than the midrange salary, as determined by the JESAP study, became "immediately 'frozen' in place, never again to be considered for an increase in salary, unless the City Council approved a COLA increase" (Dkt. No. 24, at 20).  He claims that the rule affected older employees more harshly than it affected less-tenured, younger employees (*Id.*).  He asserts that the percentage of employees over 40 whose pay was frozen was greater than the percentage of employees over 40 in the workplace as a whole and that older employees were adversely affected at a rate greater than employees under 40 when compared to their general representation in the work force (*Id.,* at 20-21).

Specifically, Mr. Faulkner claims that 132 of the 232 non-uniformed, non-elected employees were over the age of 40 in 2013 (*Id.*, at 21).  According to Mr. Faulkner, of the 66 employees who were paid higher than the midpoint established in the 2012 study, 53 of the employees were over the age of 40.  Additionally, Mr. Faulkner maintains that 166 employees received pay increases as a result of the new pay system, but only 80 of those employees were over the age of 40 (*Id.*).

According to Mr. Faulkner, there are three specific tests, requirements, or practices within the City's current pay system that adversely impact older workers:  (1) the City relied upon the Johanson Group calculations to rate job descriptions, but not all job titles were evaluated and the methodology and process were either flawed, incomplete, or unknown; (2) the City relied upon a personnel director, Ms. Mabry-Williams, who has limited knowledge of the system and its application and managed to input data to raise her own salary by $11,000 in a special review when the majority of other workers, many of them over 40, did not receive reviews or raises; and (3) the City allowed its uniformed employees—firefighters and police—to be paid on a separate system that includes step and opportunity for advancement through the steps by merit (*Id.,* at 24-25).

According to defendants, Mr. Faulkner has simply pointed to a generalized pay policy and claimed that it has an adverse impact on older workers (Dkt. No. 19, at 11).  Defendants aver that Mr. Faulkner cannot identify a specific test, requirement, or practice within the pay plan that has an adverse impact on older workers (*Id.*).  Defendants also claim that, even viewing the statistical evidence in the light most favorable to Mr. Faulkner, he still fails to meet his burden (Dkt. No. 30, at 11).  They assert that over 60% of the City's non-uniformed, non-elected employees over the age of 40 received raises.  Furthermore, Mr. Faulkner admitted that he has received two COLA increases since the City adopted the one-step pay system as well as multiple bonuses (*Id.,* at 12).

Viewing the evidence in the light most favorable to Mr. Faulkner, the Court finds that he has failed to demonstrate that the City's adoption of the one-step pay system had a disparate impact on employees over the age of 40 so as to satisfy the *prima facie* case requirement.  Mr. Faulkner claims that the new pay system adversely affected him and other employees over the age of 40 because a larger number of older employees had salaries higher than the midpoint pay identified in the JESAP study and because he claims that their salaries were frozen until the midpoint rate caught up to their current pay.  Mr. Faulkner fails to point to a specific test, requirement, or practice within the pay system that has an adverse impact on older workers.

Furthermore, Mr. Faulkner contends that the system discriminated against him based on his age because it took money out of his paycheck and because he believes that his pay is, or should be, tied to his years of service to the City.  However, the parties agree that simply because an employee has worked for the City for a long time does not mean that the employee is over 40 years-of-age.  Additionally, Mr. Faulkner fails to provide statistical evidence sufficient to show that the employment practice caused the adverse action because of his age.  Record evidence demonstrates that more employees over the age of 40 received a pay increase as a result of the pay-system change than did not.  Finally, Mr. Faulkner admits that he has received two COLA

raises since the implementation of the new system.  Viewing the record evidence in the light most favorable to Mr. Faulkner, the Court finds that he has failed to establish a *prima facie* disparate-impact claim.  Accordingly, even if Mr. Faulkner's ADEA claim were not time-barred and for this reason as well, defendants are entitled to summary judgment on Mr. Faulkner's ADEA claim.

Because the Court reaches this determination with respect to Mr. Faulkner's ADEA claim and determines that defendants are entitled to summary judgment in their favor on this claim, the Court declines to address whether defendants have established the legitimate business reason defense.

### D.    Retaliation Claim

In his response to defendants' motion for summary judgment, Mr. Faulkner asserts that his job position and updated job description were left out of the updated JESAP study (Dkt. No. 24, at 16).  He claims that the City began ostracizing him prior to 2012 because of an in-house dispute concerning police department overtime (*Id.*).  Mr. Faulkner did not raise a retaliation claim in his complaint.  To the extent Mr. Faulkner attempts to assert a retaliation claim in his response to defendants' motion for summary judgment, the Court will not permit him to do so at this stage of the litigation and will not address such a claim.  The Court finds that any claim that the City ostracized Mr. Faulkner or excluded him from participating in the JESAP study is immaterial to the claim Mr. Faulkner does assert regarding whether the compensation system had a disparate impact on City employees over the age of 40.

### IV.    Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment on all of Mr. Faulkner's claims (Dkt. No. 17).  This case is dismissed with prejudice and the relief that Mr. Faulkner seeks is denied.

It is so ordered this 28th day of May, 2020.

Kristine G. Baker
United States District Judge